2026 IL App (1st) 240126

No. 1-24-0126

April 10, 2026

FIFTH DIVISION

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| THE PEOPLE OF THE STATE OF ILLINOIS, ) | Appeal from the Circuit Court |
|---|---|
| ) | of Cook County. |
| Plaintiff-Appellee, ) | |
| ) | |
| v. ) | 03 CR 10179 |
| ) | |
| CHANCELLOR AARON, ) | The Honorable |
| ) | Mary Margaret Brosnahan, |
| Defendant-Appellant. ) | Judge, presiding. |

JUSTICE ODEN JOHNSON delivered the judgment of the court, with opinion.
Justice Mikva concurred in the judgment and opinion.
Justice Wilson specially concurred, with opinion.

**OPINION**

¶ 1         Defendant Chancellor Aaron was convicted after a jury trial of first degree murder and

sentenced to 45 years with the Illinois Department of Corrections (IDOC). On direct appeal,

the only issue raised was the alleged ineffectiveness of trial counsel, and defendant's

conviction was affirmed. *People v. Aaron*, 385 Ill. App. 3d 1125 (table) (unpublished order

under Illinois Supreme Court Rule 23)). The trial court's subsequent summary dismissal of

defendant's 2009 postconviction petition was similarly affirmed. *People v. Aaron*, 2012 IL App (1st) 100056-U.

¶ 2        However, this court reversed the trial court's 2013 order, which had denied defendant leave to file a successive postconviction petition. *People v. Aaron*, 2015 IL App (1st) 131865-U, ¶ 2. We found that defendant had presented a colorable claim of actual innocence based on newly discovered evidence, where the key witness at defendant's trial testified at the subsequent trial of defendant's codefendant and "recanted his identification of defendant as the killer." *Aaron*, 2015 IL App (1st) 131865-U, ¶¶ 2-4, 11-12. We found that this recantation and testimony was of such a conclusive character that it would probably change the outcome upon retrial. *Aaron*, 2015 IL App (1st) 131865-U, ¶ 17. As a result, we reversed the trial court's denial and remanded defendant's successive petition "for second-stage proceedings including the appointment of counsel." *Aaron*, 2015 IL App (1st) 131865-U, ¶ 17.

¶ 3        In the instant appeal, defendant appeals the denial of his petition after a third-stage evidentiary hearing. For the following reasons, we reverse and remand for a new trial.

¶ 4                                BACKGROUND

¶ 5                              I. Evidence at Trial

¶ 6        Defendant and codefendant Kirk Horshaw were charged with the first degree murder of Aaron Crawford and the attempted first degree murder of Daniel Wesley. The charges stemmed from a shooting on May 7, 2002. In 2005, the State proceeded to trial against defendant solely on the first degree murder charge stemming from Crawford's death. At defendant's trial, Wesley, who had been the subject of the now dropped attempted murder charge, became a key witness. He is also the witness who subsequently recanted. Having

already described the evidence at trial in our prior order (*Aaron*, 2015 IL App (1st) 131865-U), we summarize it below.

¶ 7        Prior to trial, a short proceeding was held on Friday, September 2, 2005. The court noted that the trial was set for the upcoming Tuesday and asked why they were there on a Friday. The assistant state's attorney (ASA) explained:

"Judge, we are on day 115 of a 120 day term[1] on the 6th of September.

The witness who we have brought before you, Mr. Wesley, is the witness we have been looking for[,] for at least two to two-and-a-half months running out our term to try this case. He has been found."

The ASA explained that another judge had already prepared a certificate so that the State could declare him a material witness and order him brought back from Minnesota to Illinois to testify. However, the State needed another order to keep him in custody. Wesley stated that he had "no problem helping them lock this man up" but he objected to being in custody. Wesley explained that he had been living on the street, that he had now enrolled in Job Corps, that Job Corps had paid for him to visit his family over the Labor Day weekend, but that he needed to go back. The ASA stated that she was in touch with Job Corps, and they said they would not penalize him. Wesley asked if he could stay in a hotel. However, the court remanded him to the custody of the Cook County State's Attorney's Office.

¶ 8        At trial, Wesley—the witness who subsequently recanted—testified that he was with the murder victim on a street corner when they observed defendant and codefendant across the

---

[1]On direct appeal, the State conceded that 118 days of delay, out of a permissible 120 days, had elapsed as of August 30, 2005, while the State looked for Wesley and that the speedy-trial clock was tolled on that day only because defense counsel did not object to the September 6, 2005, trial date proposed by the State. However, defendant's claim of ineffectiveness on this ground did not succeed on appeal. *Aaron*, slip order at 9-10.

street. Wesley and the victim belonged to the Black Disciples gang, while defendants were in the rival Gangster Disciples gang. Wesley had known defendant for more than seven years. In short, the victim and codefendant Horshaw had an argument; Horshaw drew a gun from his waistband; and Wesley fled. Wesley testified that he observed both defendant and codefendant Horshaw firing guns but did not see who shot the murder victim. Codefendant's gun was a black automatic gun, while defendant's gun was a smaller handgun; defendant and codefendant were dressed all in black. Wesley heard 10 or 11 shots. When the shooting stopped, the victim was lying on the ground. Wesley, and another Black Disciple named Jermaine, drove the victim to the hospital.

¶ 9        Wesley testified that, after the hospital, he and Jermaine went to a restaurant near the shooting and police approached them. Wesley testified that, during a police interview on the night of the shooting, Wesley stated that he observed defendant with a gun. Several months after the shooting, Wesley was arrested on unrelated gun charges and pled guilty to a weapons charge. In April 2003, Wesley was arrested again and gave a statement to the police and an ASA that implicated defendant in the Crawford shooting. A month later, in May 2003, Wesley testified before the grand jury regarding defendant.

¶ 10       Wesley testified that, over a year later, on December 11, 2004, after Wesley had been released from prison, defendant's brother asked Wesley to give a statement to defense counsel Joseph Breen. Wesley signed an exculpatory statement that Breen had reviewed with Wesley before signing. Wesley's full statement to Breen was not published to the jury. The trial court admitted only as impeachment the small portion of the statement that asserted that Wesley had seen the faces of both shooters and that neither belonged to defendant. *Aaron*, slip order at 5.[2]

---

[2]On direct appeal, this court found that

4

¶ 11    In the full statement which the jury did not see, Wesley stated:

"I witnessed the shooting of Aaron Crawford. I cannot identify the individuals who are responsible for the shooting. I identified Kirk Horshaw and Chancellor Aaron as the shooters because police detectives told me to identify them.

My written statement to the State's Attorney is mostly true. I did witness the shooting. Just before the shots were fired, we were outside Aaron Crawford's girlfriend's home. Aaron called my name, I turned and saw two men.

Both men began to fire guns in our direction. I turned and ran.

I saw both of the shooters['] faces. Neither face belonged to Chancellor Aaron.

I have known Chancellor Aaron for much of my life. My statement and identifications were made because of pressure from police detectives.

I have been arrested several times since the shooting. The Detectives would come to see me and make sure that I was going to testify against Chancellor.

The handwritten statement and my testimony before the Grand Jury were made only because of the threats made by these detectives.

I decided to speak to Chancellor's attorneys because he did not do this and it wouldn't be fair for him to go to jail for something he did not do."

At defendant's trial, Wesley testified that the above-quoted exculpatory statement was not true, and Wesley denied that anyone had threatened him into giving the statement. At the end of his

---

"Wesley's statement to Breen would have been admissible as substantive evidence under section 115-10.1 of the Code because it was inconsistent with Wesley's inculpatory statements at trial (725 ILCS 5/115-10.1(a) (2004)); Wesley was cross-examined about the statement at trial (725 ILCS 5/115-10.1(b) (West 2004)); the statement described an event within Wesley's personal knowledge (725 ILCS 5/115-10.1(c)(2) (West 2004)); and Wesley admitted that he signed the statement (725 ILCS 5/115-10.1(c)(2)(A) (West 2004))." *Aaron*, slip order at 10-11.

direct examination, Wesley acknowledged that he was not happy the Friday before his testimony, when he was first brought in from another state and met with the ASA. The ASA asked: "What did I tell you about what you should say on the witness stand?" Wesley replied: "Told me just to say—give the statement that I gave you all and not to use his nickname." The ASA then queried but "what *** about the truth?" Wesley agreed that he had been told to tell the truth.

¶ 12    On cross examination, Wesley acknowledged that he had been in custody since Friday, waiting to testify, and that he did not want to make these people upset because they held the keys to when he could go home. Wesley testified that, earlier on the day of the shooting, he smoked marijuana and that, prior to the shooting, he drank some gin. Wesley estimated that, between the moment he saw the two men across the street and until the shooting was over, only five seconds had elapsed. During those five seconds, he was running. After the hospital, when Wesley went to the restaurant, the police took him into custody, and he was not free to leave. Wesley remembered telling the police that codefendant pulled out a large semiautomatic pistol from his waistband and began firing at the victim. However, Wesley did not recall what he said regarding defendant.

¶ 13    On cross, Wesley testified that he did not meet with the police again until he was arrested again. On April 12, 2003, after he was arrested for possession of a firearm and was not free to go, he signed a statement that was written out for him. Six days later, on April 18, 2003, his case was dismissed, and he was released. The case that was dismissed was the same case for which he had been arrested on April 12, 2003. In addition, he had two other separate gun cases to which he pled guilty. For the first one, he was arrested on November 8, 2003; pled

guilty on December 12, 2003; and was sentenced to a year but served only 61 days. While on parole, he was arrested again with a gun, again pled guilty, and again served only 61 days.

¶ 14        Karen Luckett testified at defendant's trial that, on May 7, 2002, she was looking out her kitchen window when she observed a car pull into a vacant lot and two men exited it. When asked if she saw one of the two men in court, Luckett pointed at defendant saying, "Looks a little different today but in the white shirt." Luckett testified that defendant, who was the driver, exited the car "with a cylinder type object," put the cylinder down next to the car, and pulled out a gun from the cylinder. When asked what she saw next, she replied that she "saw nothing" because her phone rang and she went into her "great room" to answer it. After answering the phone, Luckett thought she heard fireworks but her neighbor, whom Luckett was speaking with, said "no, that's gunshots." Luckett heard four or five shots and went back to her kitchen, where she looked out the window. She then hung up from her friend, called 911, and went from her kitchen to her enclosed back porch, which is adjacent to the kitchen but has larger windows. Luckett looked out her back porch windows with a pair of binoculars that she keeps handy because she is a "CAPS volunteer."[3] Luckett observed defendant and the other man running and observed two or three men pick up a person, who they placed in a car that then drove off. Luckett noticed that the car, which had been in the vacant lot, was gone. Later that evening, Luckett spoke with a police officer, and at some point on May 7 or 8, 2002, she went to the Area 2 police station.

¶ 15        Luckett testified that, on July 11, 2002, she returned to Area 2 to view a lineup from which she identified defendant as someone whom she recognized from that evening.[4] Luckett

_____

[3]On the direct appeal in this case, this court explained that the abbreviation "CAPS" was a reference to "the Community Alternative Policing Strategy" program. *Aaron*, slip order at 5.

[4]As this court observed in its order affirming the dismissal of defendant's initial postconviction petition, "he *might* have been wearing an EMD [electronic monitoring device]" on his

testified that she informed police that defendant was the person whom she saw exit the car with the cylinder but that she "did not see him do the shooting." An hour after the lineup, after speaking with an ASA, Luckett signed a written statement. On December 12, 2002, Luckett returned for another lineup, from which she identified the other person who was with defendant.

¶ 16 On cross, Luckett agreed that nowhere in her July 2002 statement does it say that she observed defendant remove a gun from a cylinder. Luckett admitted that in the statement, which was given two months after the shooting, Luckett had stated that she observed defendant running and stumbling but that she could not tell whether he had a gun or not. However, now on cross, she asserted that he had a gun in his hand as he ran into a stairwell, which was behind her building and adjacent to the vacant lot. Luckett testified that defendant looked a little different now than he had on the night of the shooting, in that his hair was previously "in a large afro" and that now he looked more slender in the face. She testified that defendant looked pretty much the same and weighed about 150 or 160 pounds. Later, she said it could be 180 or even 200 pounds. Luckett stated that, on the night of the shooting, defendant was wearing a white t-shirt, dark jeans, and a black jacket.

¶ 17 On cross, Luckett testified that she lived on the third floor, that it was not yet dark out when the shooting occurred, and that it was about 7:30 or 8 p.m. When asked if the shooting was after 9 p.m., she replied, "It wasn't 9 o'clock I'll tell you that right now." When confronted with her prior statement, which said the shooting was at 9:10 p.m., she said it occurred earlier

---

ankle "during Luckett's lineup identification" of defendant on July 11, 2002. (Emphasis in original.) *Aaron*, 2012 IL App (1st) 100056-U, ¶ 15.

than that. She then denied that the shooting was "7:30 or thereabouts" and asserted that it was between 8 and 9 p.m. Luckett acknowledged that she had never seen defendant before.

¶ 18    Officer Chris Ware testified that, on May 7, 2002, he and his partner went to the area of the shooting, shortly after the shooting occurred, and they noticed a couple of men in a restaurant, located a few feet from where the shooting occurred. One of the men was Wesley, who had blood on his person. The officers transported the two men to Area 2, where a detective spoke with Wesley.

¶ 19    Detective John Fassl testified that he interviewed Wesley on the night of the shooting, while Detective Baker interviewed Jermaine Williams. Both Wesley and Williams had been transported to Area 2. After their respective interviews, both men were allowed to go home. After speaking to Wesley, Detective Fassl issued an investigative alert for defendant and codefendant who Wesley had identified from photo spreads. On July 12, 2002, Detective Fassl testified that he was present when Luckett viewed a lineup and that she identified defendant as the shooter. After Luckett's identification, he contacted an ASA, who came to interview Luckett. However, the ASA declined to approve charges and defendant was released. In December 2002, Detective Fassl was again present when Luckett selected codefendant from the lineup as one of the offenders. The detective again contacted an ASA, who came and interviewed Luckett and who again declined to approve charges. Detective Fassl was not present when Wesley was later arrested in April 2003.

¶ 20    On cross, Detective Fassl testified that when he interviewed Wesley on the night of the shooting, Wesley stated that he did not see whether defendant was armed at the time of the shooting. Between the date of the shooting and April 2003, when Wesley was arrested for possession of a firearm, the detective visited Wesley's home and tried to contact Wesley

several times without success. The detective confirmed that when Luckett was interviewed by the ASA on July 12, 2002, Luckett stated that she never saw defendant with a gun. However, on redirect, the detective testified that, earlier that same evening and during the lineup, Luckett identified defendant to the detective as the man who she had seen exit a car and retrieve a pistol from a cylinder.

¶ 21 Detective Alejandro Almazan, Detective Fassl's partner, testified that on April 15, 2003, he obtained an arrest warrant for both defendant and codefendant. When defendant was arrested, Detective Almazan described defendant in his arrest report as a 26-year old black male, 6 feet tall, 250 pounds, with black braids.

¶ 22 The parties stipulated that an assistant medical examiner, if called, would testify that the murder victim died from a single gunshot wound to the chest. Forensic evidence established that two guns were involved in the shooting. Eleven shell casings, which were fired from two different guns, were recovered from the crime scene. Defendant's motion for a directed verdict was denied. After listening to the evidence, closing arguments, and jury instructions, the jury found defendant guilty on September 8, 2005. On December 19, 2005, defendant was sentenced to 25 years for the murder, plus 20 years for a mandatory firearm enhancement, yielding a total sentence of 45 years. Denying defendant's motion to reconsider sentence, the court noted that defendant received close to the minimum sentence, which was 40 years.

¶ 23 II. Defendant's Motion for Leave to File

¶ 24 In January 2013, defendant moved for leave to file a successive petition. Defendant alleged that the State knowingly used perjured testimony from Wesley; that defendant could not have known about Wesley's recantation during codefendant's trial until after that trial had occurred, which was in 2010; and that Wesley's recantation testimony would probably change

the result of any new trial, since Luckett's testimony was neither credible nor conclusive. As a result, defendant asserted that Wesley's testimony at the codefendant's trial was newly discovered evidence of defendant's actual innocence.

¶ 25     Defendant's motion included a transcript of Wesley's direct testimony at the codefendant's trial. Wesley testified that he had been drinking and smoking marijuana during the day and that, at night, he was standing outside when he heard shots. Wesley saw the murder victim on the ground and fled. After the shooting stopped, he returned to the victim, and he and Williams brought the victim to the hospital. After Wesley and his friend Williams left the hospital, they went to a restaurant near the scene. While there, police detectives saw blood on Williams' shirt and started asking questions. Although Wesley claimed he did not know anything, the detectives took him to a police station and placed him and Williams in different rooms. Wesley testified that the detectives forced him to identify photos from a spread. Although Wesley admitted that he had identified defendant and given a statement, he testified that "it was script." Wesley explained: "When you are getting shot at, you don't really [know], who is that shooting? You are trying to get away." Wesley testified that, when he spoke to the detectives, he was intoxicated, he did not know what he was saying, and he was just trying to get out of the police station. Wesley did not recall giving another statement in April 2003 to police. Wesley did acknowledge testifying both before the grand jury in May 2003 and at defendant's trial, but he did not remember what he said. Wesley acknowledged that he had two prior felony gun convictions in Illinois and that he was (then) currently serving a prison sentence in Minnesota for aggravated battery.

¶ 26　　　　　As noted above, the trial court denied defendant's motion for leave to file a successive petition, which this court reversed on appeal. On remand, the third stage evidentiary hearing was held, which is the subject of the present appeal.

¶ 27　　　　　　　　　　　III. Defendant's Amended Petition

¶ 28　　　　　On remand, the circuit court half-sheets indicate that the case was assigned on March 28, 2016, to the trial judge who had previously denied defendant leave to file. On April 13, 2016, a privately-retained counsel filed an appearance for defendant and subsequently filed an amended postconviction petition on November 16, 2017. The amended petition attached the transcripts of Wesley's recantation testimony, which had been the basis for the appellate court's reversal. In addition, counsel attached further evidence—namely, four affidavits: a recent affidavit from Wesley that comported with his testimony at the codefendant's trial; two affidavits from Adrian Kennard, an eyewitness to the shooting who averred that defendant did not shoot the victim; and an affidavit from Barbara Lindsey, yet another eyewitness who averred that defendant did not shoot the victim.

¶ 29　　　　　Wesley's affidavit, dated August 8, 2017, stated:

"I originally testified at the trial of [defendant], for murder, case number 03 CR 10179, in September of 2005. I identified [defendant] at trial, only because I was coerced to do so, with threats of further incarceration by the detectives. My testimony was essentially scripted. It was not the truth as it relates to [defendant] participating in the murder of Aaron Crawford on May 7, 2002, at [an address] in Chicago.

In May 2007, I was in custody in Minnesota when I was brought back to Chicago to testify against [defendant's] co-defendant, Kirk Horshaw. Before trial, I informed the two assistant s[t]ate's attorneys trying the case against [the codefendant], that my

12

testimony against [defendant] from September, 2005, was not true. I was threatened with prosecution for perjury, but insisted on telling the truth.

At [the codefendant's] trial, I testified that at the time I spoke to the detectives, I was drunk, did not know what I was saying and trying to get out of the police station. All I know is I did not see [defendant] shoot my friend, Mr. Crawford. After [the codefendant's] trial, I was not prosecuted for perjury by the Cook County State's Attorney's office."

¶ 30    Adrian Kennard's handwritten affidavit, dated April 13, 2015, stated:

"On May 7, 2002, at 8:30 p.m. I witness[ed] the shooting of Aaron Crawford. I was standing outside the laundromat smoking a cigarette when I saw [the murder victim], [Wesley], [Williams} standing together. Then I saw t[w]o man [*sic*] across the street with guns. And at [no] time did I see [defendant] as one of the shooters. I've known [defendant] since high school and I [would] know for a fact if it was [defendant] I would it [*sic*]. The reason I haven't come forward before is cause I was fearful for my life. So, I'm coming forward today cause a[n] innocent man is locked up for something he didn't do."

¶ 31    Kennard's typed affidavit, dated November 8, 2017, provided further detail:

"On May 7, 2002, at approximately 8:30 p.m., I was at 71st Street and Paxton/Luella in Chicago. I knew [defendant] since first grade and [the murder victim] from the neighborhood. [Defendant] was on the Paxton side of the street with me; [the murder victim] was on the Luella side of the street with some other boys.

I saw two men approach [the murder victim] with guns. As soon as I saw the guns, I turned. [Defendant] was only a few feet from me on the Paxton side of the street.

[Defendant] said, 'Come on T, let's run down the gangway'. (T is my nickname) We both ran down the gangway and waited until an ambulance came. [Defendant] could not have done this shooting.

I did not learn [defendant] had been charged with the murder of [the victim] until at least over a year or two later. I did not do anything, such as go to the police, because growing up in the neighborhood I did, I was in fear of my life if I did so."

The affidavit further stated that Kennard wrote out the handwritten affidavit, dated April 13, 2015, after she was contacted by defendant's brother, and that she signed this typed affidavit after being contacted by defendant's attorney.

¶ 32    Barbara Lindsey, another eyewitness, stated in her handwritten affidavit, dated April 13, 2015, that:

"On May 7, 2002, at about 8:30 p.m. I witness[ed] the shooting of [the murder victim]. I was on the corner of 71 'n Paxton. When I saw [the victim,] [Wesley], [Williams] was on the opposite side of the tracks where the laundromat is located. At [*sic*] the reason I didn't come forward earlier is because I was scared for my safety. I [k]no[w] for a fact it wasn't [defendant] cause the person I saw was light skinned. The reason I decided to speak out now is because he did not do this and it wouldn't be fair. Recently, I ran into his brother an[d] I told him what I had seen an[d] I am willing to do whats right[,] it being on my mind for the last 13 years. That's why I'm writing this today."

On October 4, 2023, defense counsel stated that he was withdrawing Lindsey's affidavit because he believed it was not properly authenticated. However, the State stated that it had no

objections to any of the exhibits, and the trial court's subsequent order treated Lindsey's affidavit as admitted.

¶ 33                                    IV. Proceedings on Remand

¶ 34            On April 5, 2018, the State informed the court that it was investigating the witnesses who had submitted affidavits. On August 16, 2018, the ASA informed the court that the State had completed its investigation, that she had "all of the investigator reports," and that she "just need[ed] to review everything to make a determination as to whether" to file a motion to dismiss or an answer. Defense counsel then asked that the State tender the reports at the next court date. The ASA agreed that the State would tender them if it filed an answer.

¶ 35            On November 29, 2018, a year after defendant filed his amended petition, the ASA stated that the State was not going to file a motion to dismiss, that it agreed to an evidentiary hearing, that it had filed a "general denial" answer, and that it had tendered "all of our discovery" to defense counsel. On April 4, 2019, the ASA stated that she had "tendered a stack of discovery," which was "a pretty substantial amount of paperwork."

¶ 36            From 2019 until 2023, the case was continued by agreement, mostly due to the COVID-19 pandemic. On June 13, 2019, a hearing was set for September 12, 2019, which was reset to November 14, 2019. On November 14, it was reset to February 13, 2020, when it was reset to April 23, 2020. At that point, the pandemic had just started.

¶ 37            On August 14, 2020, the trial court noted that the case was "in a position to set for hearing and then COVID interrupted it," and so the court set the case for status on September 29, 2020. On November 18, 2020, a Zoom hearing was held, at which defense counsel asked for a January 2021 status date, "given the situation with COVID." At a Zoom conference on January 21, 2021, the State noted that they were in "the same situation," and the court agreed,

noting that a hearing would involve "civilians." On April 15, 2021, the court noted that it had begun to do in-person hearings and said that it would set the case for "one more final status date." Defense counsel indicated that he preferred a hearing in person. On June 8, 2021, defense counsel stated that they were waiting to see "what is going on" with in-person hearings and persons in IDOC, and the court responded that it did not have an answer on that yet.

¶ 38    On August 23, 2021, in response to a question by the court, the ASA said that there were witnesses, but she did not know where they were located. Defense counsel asked for more time because the defense had a witness who was out of state. A status date was set for October 26, 2021, to verify the availability of defense witnesses for a November hearing. On December 16, 2021, the ASA stated that "on the last court date, the co-defendant's case came down from the Appellate Court and [defense] counsel, and I wanted to review it to see if it had any bearing on this case. I believe we would both agree that it does not." Defense counsel stated that he had "a witness, potentially, from the state of Minnesota," and the court set a status date for March. On March 10, 2022, a hearing was set for June 29, 2022, when defense counsel asked for it to be reset again because he was having "difficulty in regard" to an out-of-state witness. On December 5, 2022, the hearing was reset to February 23, 2023, and again to May 16, 2023.

¶ 39    On May 16, 2023, defense counsel informed the court that he had previously contacted Wesley, who lives in another jurisdiction, but now counsel was "unable to contact him and locate him." Counsel said that if he could not locate Wesley, the defense would proceed without him. On October 4, 2023, the parties answered ready for a third-stage postconviction hearing.

¶ 40    The ASA stated that the State had no objections to any of the exhibits that were attached to the amended postconviction petition, which we already described above. *Supra* ¶¶ 28-32. The State introduced the appellate record, which included the trial record.

¶ 41    Next, defense counsel introduced an exhibit that had not been previously attached to the amended petition. At the hearing, counsel described it as an investigative report from the Cook County State's Attorney's Office Investigations Bureau, which memorialized a statement taken from Wesley at a Minnesota correctional facility in July 2018. Counsel argued that Wesley told investigators for the state's attorney's office that the affidavit that he had provided to counsel was valid, as was his testimony in the codefendant's trial, and that defendant was not responsible for the offense for which he had been convicted.

¶ 42    The document was admitted without objection and marked as defendant's exhibit No.7. The text of the report states in full:

"Chancellor Aaron has been arrested, tried and convicted for the 07 May 2002 shooting death of Aaron Crawford. A post-conviction motion has been filed for Chancellor Aaron and an affidavit in the name of Daniel Wesley has been submitted. The affidavit states, among other things, Wesley did not see Chancellor Aaron shoot and kill Aaron Crawford. The Reporting Investigators were then assigned to locate and interview Wesley regarding his knowledge of this incident and the submitted affidavit.

Wesley was subsequently located on 18 Jul [*sic*] 18 as an inmate in the Minnesota Correctional Facility Stillwater in Bayport, MN where he agreed to be interviewed. He acknowledged being present when his friend, Aaron Crawford, was shot and killed at 71st and Luella in May 2007. Wesley stated he was talking with some girls when Crawford called his name and told him to watch out. Wesley said he looked up and saw

17

two men across 71st shooting in his and Crawford's direction. Wesley stated he began to run and did not see the faces of the men shooting. Wesly stated Chancellor Aaron, whom he has known for several years, was not one of the men shooting. Wesley was reminded he couldn't see the faces of the shooters and was asked how he could be sure it wasn't Chancellor Aaron. Wesley stated he knows it wasn't Chancellor because Wesley was familiar with his build and neither of the shooter's [*sic*] build matched that of Chancellor's.

Wesley said he and another male put Crawford in Crawford's girlfriend's car and drove him to the hospital. Wesley couldn't remember the names of the other male or Crawford's girlfriend. When reminded of the names Jermaine and Lesley, Wesley did remember the names but hasn't spoken with or seen the two since the shooting.

Wesley stated the information he had given to the police officers, and his testimony was not true. Wesley stated he 'felt pressured' to name Chancellor Aaron as one of the two men who shot at him and Crawford. He could not say how he felt pressured. Wesley stated the truth is what is written in the affidavit. Wesley stated he always had a 'bias' towards the police. Wesley stated he was always treated fairly by the police. When asked, Wesley stated he was treated fairly by the police in this incident.

Wesley was shown a copy of the [August 8, 2017,] affidavit and he acknowledged it and the signature was his. Wesley said he was contacted by 'Teddy Ray', Chancellor Aaron's brother. Wesley described Teddy Ray as a friend of [*sic*] he has known for many years. When asked, Wesley stated he did not know Teddy Ray's real name. Wesley said he heard from a friend, named Pat, while living in Minnesota, that Teddy Ray was trying to get in touch with him. Pat provided a phone number for Teddy Ray

18

and Wesley called him. Teddy Ray then provided Wesley with a number for Chancellor Aaron's attorney, Dean Morask. Wesley stated Teddy Ray is the same brother who drove him to Chancellor Aaron's attorney's office in December 2004 in which he provided a statement to Joe Breen. The [August 8, 2017,] affidavit and the [December 11, 2004,] are attached to this file for reference.[5]

Wesley stated he spoke with Morask on the phone and told Morask what he knew about this shooting. Wesley said he eventually received the affidavit in the mail and after agreeing with the affidavit's content, signed and had it notarized at a Wells Fargo Bank in the Minneapolis area. Wesley stated he then mailed the signed affidavit back to Chancellor Aaron's attorney.

Wesley did not add anything further and the interview concluded."

The report was signed and dated by the investigator and his supervisor on July 31, 2018.

¶ 43    After the admission of exhibit No. 7, counsel argued that the state's attorney's office did not believe that Luckett was a sufficient pillar on which to rest a case because they had defendant in custody but let him go after her identification. Counsel observed that Luckett's identification was questionable, in light of the fact that she had never seen defendant before and gave inconsistent statements about whether he had a gun. Counsel argued that Wesley was the foundation of the State's case and that Wesley should not be the foundation of any case, given that Wesley had testified or provided statements at least seven times with conflicting results. Further, there were now additional exculpatory affidavits. In sum, counsel argued that the State's only evidence was the testimony of Luckett, which had been seriously impeached, and that either Wesley's conflicting statements cancelled each other out or Wesley was telling

---

[5]Neither the affidavit nor the statement is attached to exhibit No. 7.

the truth now and when he told a detective on the night of the shooting that he had not seen defendant with a gun.

¶ 44     After listening to counsel's argument, the court asked defense counsel to make a record of the efforts that counsel went through to find Wesley. Counsel explained that he had spoken to Wesley on the phone a number of times and mailed Wesley the affidavit which Wesley signed and returned. Over the course of the prior year and a half, counsel reached out to him by phone, by mail, and through his client's family without success. The court asked if counsel had checked a database to see if Wesley was deceased, and counsel acknowledged that he had not done that.

¶ 45     The State argued that the "common thread" between Wesley and Kennard, who submitted an exonerating affidavit, was defendant's brother. In other words, the State was suggesting that defendant's brother was the reason why both came forward. The State contended that, while Luckett never saw the shooting, she did say she saw defendant retrieve a gun shortly before hearing shots. In rebuttal, counsel observed that, in this case, there was no gun, no arrest at the scene, and no admissions, which left Wesley's recanted testimony. Further, counsel argued that if Adrian Kennard was still alive, she would have been here, and there would have been testimony. However, counsel observed that live testimony was not required and that her affidavit was still admissible as evidence of actual innocence at a third-stage evidentiary hearing.

¶ 46     On January 4, 2024, the trial court stated in open court: "While it's clear that Mr. Wesley's affidavit is newly discovered evidence, based upon the discussion in the order I find that [defendant] has failed to satisfy the conclusive requirement necessary for actual innocence and a new trial so respectfully the post-conviction is going to be denied."

¶ 47                                    V. Order on Appeal

¶ 48            On January 4, 2024, the trial court issued a nine-page order denying defendant's petition. The order noted that, at a third stage evidentiary hearing, a defendant had to prove a substantial constitutional violation by a preponderance of the evidence and that, to satisfy this burden, defendant in this case had provided affidavits from (1) Wesley, (2) Kinnard, and (3) Lindsey.

¶ 49            The trial court explained that to establish his claim of actual innocence, defendant had to show that the evidence is (1) newly discovered, (2) material and not cumulative, and (3) of such a conclusive character that it would change the result on retrial. Although the trial court acknowledged that both "Lindsey and Kennard stated safety concerns were the reason they did not come forward earlier," the trial court found that defendant had failed to establish why their testimony could not have been discovered through due diligence. Thus, the trial court did not proceed to consider whether Lindsey and Kennard's affidavits were material and noncumulative. The order later stated in a sentence that their affidavits were "not conclusive," but with no explanation of why.

¶ 50            With respect to Wesley, the trial court found that defendant did establish that Wesley's 2010 testimony at codefendant's trial and Wesley's "2018 affidavit" were both (1) newly discovered and (2) material and noncumulative. It then found that his 2010 testimony and his "2018 affidavit" were not of such a conclusive character as to change the result on retrial. However, as we explain in more detail below, there was no "2018 affidavit."

¶ 51            A timely notice of appeal was filed on January 11, 2024, and this appeal followed.

¶ 52                                        ANALYSIS

¶ 53                                    I. The Act's Stages

¶ 54        The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2020)) provides a statutory remedy for criminal defendants who claim their constitutional rights were violated in the trial court. *People v. Edwards*, 2012 IL 111711, ¶ 21. It is not a substitute for appeal but, rather, a collateral proceeding that attacks a final judgment. *People v. Ealy*, 2024 IL App (1st) 221748, ¶ 30.

¶ 55        The Act contemplates the filing of a single petition. *People v. Coleman*, 2013 IL 113307, ¶ 81. However, there are two exceptions to this procedural default rule: where a defendant makes a showing of cause and prejudice or where he raises a claim of actual innocence. *Coleman*, 2013 IL 113307, ¶¶ 82-83. We permit a defendant, without any showing of cause or prejudice, to bring a claim of actual innocence in order to prevent a fundamental miscarriage of justice. *Coleman*, 2013 IL 113307, ¶ 83. Such an actual innocence claim was raised in this case, and this court permitted defendant to file a successive petition.

¶ 56        The Act generally provides for three stages of review by the trial court. *People v. Domagala*, 2013 IL 113688, ¶ 32. At the first stage, the trial court may summarily dismiss a petition only if it is frivolous and patently without merit. 725 ILCS 5/122-2.1(a)(2) (West 2020); *Domagala*, 2013 IL 113688, ¶ 32. At the second stage, counsel is appointed if a defendant is indigent and unrepresented by counsel. 725 ILCS 5/122-4 (West 2020); *Domagala*, 2013 IL 113688, ¶ 33. After counsel determines whether to amend or supplement the petition, the State may file either a motion to dismiss or an answer to the petition. 725 ILCS 5/122-5 (West 2020); *Domagala*, 2013 IL 113688, ¶ 33; *Ealy*, 2024 IL App (1st) 221748, ¶ 32. At the second stage, the trial court must determine "whether the petition and any accompanying documentation make a substantial showing of a constitutional violation." *People v. Edwards*, 197 Ill. 2d 239, 246 (2001). If a defendant makes a "substantial showing" at the second stage,

then he is entitled to a third-stage evidentiary hearing. *Domagala*, 2013 IL 113688, ¶ 34. In the case at bar, the State chose not to file a motion to dismiss, and the trial court advanced defendant's petition to the third stage.

¶ 57     At a third-stage evidentiary hearing, the defendant bears the burden of proving the alleged constitutional violation by a preponderance of the evidence. *Coleman*, 2013 IL 113307, ¶ 92. The preponderance standard is the standard whether the defendant alleges a constitutional violation or raises a claim of actual innocence. *Coleman*, 2013 IL 113307, ¶ 92. The Act provides that, at the hearing, the trial court "may receive proof by affidavits, depositions, oral testimony, or other evidence." 725 ILCS 5/122-6 (West 2020).

¶ 58     Generally, if the evidentiary hearing involved fact-finding and credibility determinations, the trial court's decision regarding a preponderance will not be reversed on appeal unless the decision is against the manifest weight of the evidence. *People v. English*, 2013 IL 112890, ¶ 23. A decision is against the manifest weight of the evidence if the decision is not based on the evidence presented, or it is unreasonable, or the opposite conclusion is clearly evident. *People v. Morgan*, 2025 IL 130626, ¶ 21. In the case at bar, defendant argues that, because there was no testimony at the evidentiary hearing from which the trial court issued determinations of credibility or fact-finding, we should review the trial court's decision *de novo*. See *Morgan*, 2025 IL 130626, ¶ 51 ("[W]e again reaffirm more than a century of this court's precedent providing an exception to the well-established principle that a circuit court's factual findings are entitled to deference—'where the evidence before a trial court consists of depositions, transcripts, or evidence otherwise documentary in nature, a reviewing court is not bound by the trial court's findings and may review the record *de novo*.' " (quoting *Addison Insurance Co. v. Fay*, 232 Ill. 2d 446, 453 (2009))); *People v. Pendleton*, 223 Ill. 2d 458, 473

(2006). In this way, the case at bar contrasts pointedly with the supreme court's recently decided opinion in *People v. McCoy*, 2026 IL 131565, ¶ 51, where the supreme court applied a manifest-weight standard to the review of a third-stage hearing that had numerous witnesses and, hence, credibility determinations. Our high court in *McCoy* explained that it would apply a manifest-weight review "*as* the circuit court was in the best position to observe the witnesses and make credibility determinations." (Emphasis added.) *McCoy*, 2026 IL 131565, ¶ 51. However, there is no reason for us to resolve this issue. In this case, the result would be the same even if we applied the more stringent manifest-weight standard, as we explain below in paragraph 67.

¶ 59                                    II. Actual Innocence

¶ 60        To succeed on a claim of actual innocence, a defendant must present evidence that is (1) new, (2) material and noncumulative, and (3) so conclusive that it would probably change the result on retrial. *Coleman*, 2013 IL 113307, ¶ 96.

¶ 61        The evidence is new if it was discovered after trial and could not have been discovered earlier through the exercise of due diligence. *Coleman*, 2013 IL 113307, ¶ 96. It is material and noncumulative if it is relevant, probative of defendant's innocence, and adds to what the jury already heard. *Coleman*, 2013 IL 113307, ¶ 96. Typically, a court will review the evidence first to determine whether it is new, material, and noncumulative. *Coleman*, 2013 IL 113307, ¶ 97. In the case at bar, the trial court determined that Wesley's 2010 testimony and "2018 affidavit" were, in fact, new, material, and noncumulative.

¶ 62        After making this initial determination, a court "then must consider whether that evidence places the evidence presented at trial in a different light and undercuts the court's confidence in the factual correctness of the guilty verdict." *Coleman*, 2013 IL 113307, ¶ 97.

"[T]he new evidence supporting an actual innocence claim need not be entirely dispositive." *People v. Robinson*, 2020 IL 123849, ¶ 56. "Rather, the conclusive-character element requires only that the [defendant] present evidence that places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt." *Robinson*, 2020 IL 123849, ¶ 56; *Coleman*, 2013 IL 113307, ¶ 97 ("Probability, not certainty, is the key ***.") In the case at bar, the trial court found that its confidence in the prior guilty verdict was not undermined.

¶ 63 Exercising *de novo* review, this court previously found that Wesley's recantation testimony alone was "of such conclusive character that it would probably change the result on retrial." *Aaron*, 2015 IL App (1st) 131865-U, ¶ 17. The remand gave the State the opportunity to investigate. After investigating, the State decided not to file a motion to dismiss and to agree to a third-stage evidentiary hearing. While defendant had the burden, the hearing also gave the State the opportunity to present opposing or additional evidence, but it did not.

¶ 64 The evidence at defendant's original trial was far from overwhelming.[6] First, there was no confession and no physical evidence connecting defendant to the shooting *Aaron*, 2015 IL App (1st) 131865-U, ¶ 17. Additionally, defendant was not arrested at the scene. Second, defendant was convicted on witness testimony alone, and there were many "issues" with this testimony. *Aaron*, 2015 IL App (1st) 131865-U, ¶ 17. Calling Luckett an eyewitness would overstate her testimony. Even though her statements waffled on whether she did or did not see defendant with a gun, she never claimed to have seen the shooting. Nowhere in her July 2002 statement, which was given only two months after the shooting, does it say that she observed defendant remove a gun from a cylinder. Luckett admitted that, in the statement, she had stated

---

[6]This court has never previously found the evidence to be overwhelming. On direct appeal, we disagreed with defendant's contention that the evidence was closely balanced, finding that "there was sufficient evidence before the jury to establish defendant's guilt *if* the jury believed the testimony of Wesley and Luckett at trial." (Emphasis added.) *Aaron*, slip order at 14-15.

that she observed defendant running and stumbling but that she could not tell whether he had a gun or not. The detective confirmed that, when Luckett was interviewed by the ASA on July 12, 2002, Luckett stated that she never saw defendant with a gun. Luckett also commented a couple of times during trial that defendant looked different from the night of the shooting.[7] Further, one could reasonably infer that the State recognized that Wesley was essential to the success of its case by the fact that the ASA twice refused to charge based on Luckett's statement alone and that the State was willing to run down the speedy trial clock until Wesley was found.

¶ 65    There were also issues with Wesley's testimony at trial. Detective Fassl testified that, when he interviewed Wesley on the night of the shooting, Wesley stated that he did not see whether defendant was armed at the time of the shooting. However, Wesley testified that, on April 12, 2003, after he was arrested for possession of a firearm, he signed a statement that was written out for him, and six days later, his case was dismissed resulting in his release. At defendant's trial, Wesley acknowledged that he had been in custody since Friday, waiting to testify, and that he did not want to make these people upset because they held the keys to when he could go home. Wesley was the one who the police picked up near the crime scene with blood on his shirt.

¶ 66    In the trial judge's earlier order, denying defendant leave to file his successive petition, the judge found that "the jury was well aware of Wesley's contradictory statements." However, we did not find this point dispositive, stating: "While the circuit court correctly noted that the jury in defendant's trial already heard evidence that Wesley gave contradictory statements, the

---

[7]Further, this court previously noted that defendant "*might* have been wearing an EMD [electronic monitoring device]" on his ankle "during Luckett's lineup identification" of defendant on July 11, 2002. (Emphasis in original.) *Aaron*, 2012 IL App (1st) 100056-U, ¶ 15.

weight of the contradictory statements then and now differs." *Aaron*, 2015 IL App (1st) 131865-U, ¶ 17. At that time, the only posttrial statement available to us was Wesley's 2010 testimony. On remand, there was not only Wesley's 2010 testimony, but also Wesley's 2017 affidavit and the State's confirming 2018 investigative report. Yet, on remand, the trial court rejected Wesley's statements with the same finding as before—namely, that "[t]he jury already heard evidence substantially similar to that proffered."[8]

¶ 67    The trial court erred, and its finding was against the manifest weight of the evidence, where it failed to consider all of the evidence. As we noted above, the trial court found that Wesley's 2010 testimony and his "2018 affidavit" were not of such a conclusive character as to change the result on retrial. However, there was no "2018 affidavit." In purportedly quoting from Wesley's "2018 affidavit," the trial court conflated two different pieces of evidence: (1) the 2017 affidavit obtained by defendant's attorney and (2) the 2018 investigative report, signed and authored by state's attorney investigators.[9] Throughout its order, the trial court quoted the 2017 affidavit but cited the 2018 report. By conflating these two documents, the trial court failed to consider the totality of the evidence offered by defendant at the third stage evidentiary hearing.

¶ 68    It is for this same reason that a *de novo* standard of review would yield the same result: reversal. By quoting the 2017 affidavit but attributing it to the 2018 report, the court's order failed to acknowledge there were two statements. As a result, the order failed to appreciate that Wesley was providing the same statement, no matter who was taking it down—that when the

---

[8]As we noted above, the jury did not hear Wesley's full statement to Breen but only a small portion of it. *Supra* ¶ 10.

[9]This court ordered the appellee, the State's Attorney of Cook County, to supplement the record with this document as it was specifically referred to in the order, which is the subject of this appeal, but was not contained in the record.

State sent two investigators to probe Wesley's statement, they received an affirmation of the statement provided to defense counsel.

¶ 69       We previously concluded: " 'Because there was no physical evidence linking the defendant to the crime scene, and further given that the evidence against the defendant was comprised solely of witness testimony, we believe that this specific situation warrants a review of [a key trial witness's] new recantation' in further post-conviction proceedings." *Aaron*, 2015 IL App (1st) 131865-U, ¶ 17 (quoting *People v. Steidl*, 177 Ill. 2d 239, 261 (1997)). On remand, "this specific situation" was reviewed by two State investigators who confirmed the firmness of the recantation—and yet this evidence was not considered. Two State investigators met with Wesley in a jail cell for an unspecified period of time, and at the end of it, they had to admit that Wesley stuck to the statement in his affidavit.

¶ 70       The State does not argue on appeal that Wesley's potential unavailability at a retrial precludes reversal or that a reversal cannot be ordered on documents alone. Thus, any such argument is waived. See Ill. R. Evid. 1101(b)(3) (eff. Sept. 17, 2019) (the rules of evidence do not apply to "postconviction hearings"). With regard to unavailability, the State argues only that "because none of these purported eyewitnesses testified at the evidentiary hearing, the brief averments contained in the affidavits were not subject to cross-examination." While that may be true of Lindsey and Kinnard, who died, that is certainly not true of Wesley, who was subject to examination by the State multiple times, as well as to a more recent interrogation.

¶ 71       In its brief, the State suggests that a reversal here would somehow conflict with our prior holdings in codefendant Horshaw's case affirming his conviction. That argument is disingenuous at best. First, the State called witnesses at Horshaw's bench trial who did not appear at defendant's jury trial, including two event witnesses and one witness who

recounted a statement by Horshaw. *People v. Horshaw*, 2013 IL App (1st) 111072-U, ¶¶ 5-10. In addition, Horshaw called four alibi witnesses, which put their credibility into play. *Horshaw*, 2013 IL App (1st) 111072-U, ¶ 22. Thus, comparing the two convictions is like comparing apples and oranges. Second, after Horshaw's direct appeal, this court found only that "[t]he evidence, viewed in the light most favorable to the prosecution, was sufficient ***." *Horshaw*, 2013 IL App (1st) 111072-U, ¶ 1. Third, the issue in Horshaw's direct appeal was whether there was sufficient evidence to sustain his conviction for the attempted murder of Wesley, a charge that defendant did not face. *Horshaw*, 2013 IL App (1st) 111072-U, ¶¶ 1, 4. Fourth, Horshaw's primary argument on appeal was that "there was no indication that anyone ever shot at Wesley," as opposed to the murder victim, Crawford. *Horshaw*, 2013 IL App (1st) 111072-U, ¶ 24. The direction that the shooters were firing was simply not an issue in defendant's case. In affirming Horshaw's conviction, we cited in support Wesley's recantation statement to defendant's attorney which maintained that the shooters, who did not include defendant, were firing in Wesley's direction. *Horshaw*, 2013 IL App (1st) 111072-U, ¶¶ 19, 26. Fifth, the issues raised in Horshaw's postconviction petitions were completely unrelated to the issues here. We affirmed (1) the summary dismissal of Horshaw's initial petition that alleged that his trial counsel provided ineffective assistance by advancing an alibi defense, and thereby preventing Horshaw from raising a claim of self-defense (*People v. Horshaw*, 2016 IL App (1st) 140829-U, ¶ 1), and (2) the denial of leave to file a subsequent petition that raised solely sentencing issues (*People v. Horshaw*, 2024 IL App (1st) 182047-B, ¶ 30). Neither Horshaw's petitions nor his direct appeal relates to the issues presented here.

¶ 72    The order below relied heavily on the fact that recantation evidence is typically entitled to scant weight. However, this is not typical recantation evidence. Wesley provided not simply a statement but cross-examined trial testimony, and his statements have been remarkably consistent ever since, no matter who was taking them down. After testifying to defendant's innocence in 2010, Wesley provided statements, first to defense counsel in 2017 and again to State investigators in 2018. The State's Attorney's Office sent investigators for the purpose of probing the statement that he had provided to the defense, and they came away with essentially the same statement.

¶ 73    In sum, this court previously found Wesley's prior 2010 testimony to be of such a conclusive character as to likely change the result on retrial. Since that finding, Wesley has maintained that testimony to defense counsel and the State alike. In addition, two more witnesses came forward. For these reasons, our confidence in the prior verdict is undermined, and we find a retrial is warranted.

¶ 74                                    CONCLUSION

¶ 75    In addition to his claim of actual innocence, defendant argued in the alternative that his postconviction counsel provided unreasonable assistance by failing to locate and secure witness testimony in support of defendant's actual innocence claim. Since we find defendant's actual innocence claim persuasive, we need not address this alternative claim. For the reasons already discussed above, we reverse and remand for a new trial.

¶ 76    Reversed and remanded.

¶ 77    JUSTICE WILSON, specially concurring:

¶ 78    I concur in the judgment granting the defendant a new trial, but write separately, if but only to muse, to address a doctrinal ambiguity that I feel exists, undermining the clarity and

consistency of postconviction jurisprudence. That question: What standard of review should govern appellate consideration of third-stage evidentiary hearings conducted exclusively on documentary submissions?

¶ 79　　　　At the heart of this ambiguity lies a tension between two lines of authority. On one hand, the general principle is that appellate courts review questions of law *de novo* (*People v. Robinson*, 2020 IL 123849, ¶ 39), while findings of fact—especially those involving credibility determinations—are reviewed for manifest error (see *People v. Coleman*, 2013 IL 113307, ¶¶ 97-98). This distinction is clear when the trial court hears live testimony, as the factfinder's ability to observe demeanor and assess credibility firsthand justifies deference. See *People v. Reed*, 2020 IL 124940, ¶ 51; *People v. Domagala*, 2013 IL 113688, ¶ 34. On the other hand, when all evidence is documentary, the rationale for deference is less obvious: the appellate court is in as good a position as the trial court to evaluate affidavits and written submissions. See *People v. Morgan*, 2025 IL 130626, ¶ 51.

¶ 80　　　　In this case, the defendant argues that the decision of the circuit court should be reviewed *de novo* because there was no live testimony at the third-stage hearing, only the presentation of documentary submissions. The State, to the contrary, urges that review should be for manifest error because the trial court considered affidavits and made credibility determinations based upon the totality of the evidence presented.

¶ 81　　　　Our supreme court's recent decision in *People v. McCoy*, 2026 IL 131565, ¶¶ 50, 63, reminds us that the third stage is, by definition, a factfinding stage. The trial court is still tasked with weighing the reliability and significance of new evidence, as it did here with Wesley's recantation and the affidavits of Kennard and Lindsey. See *Reed*, 2020 IL 124940, ¶ 51 ("At this [third] stage, the trial court acts as a factfinder, making credibility determinations and

weighing the evidence."). This factfinding function is assigned to the trial court, and we should defer to the court's factual findings.

¶ 82        Yet, in my opinion, the case law is not uniform. Some decisions suggest that when the trial court's findings are based solely on written submissions, *de novo* review may be appropriate, as the appellate court can independently assess the same record. Others maintain that the manifest error standard should apply, regardless of the form of evidence, to preserve the trial court's central role in the postconviction process. We need not resolve this tension in this case; as noted, the outcome here would be the same under either standard. Yet, this ambiguity is not merely academic: it could have real consequences for litigants and for the integrity of future postconviction proceedings.

¶ 83        If appellate review defaults to *de novo* whenever no live testimony is presented, parties may be incentivized to manipulate the form of evidence to secure a preferred standard. Defendants might avoid calling live witnesses during the third-stage hearing to invite broader appellate scrutiny; the State might insist on live testimony to limit review. Such strategic behavior would distort the postconviction process and undermine its truth-seeking function.

¶ 84        Moreover, when the postconviction judge is the same as the trial judge, and new evidence is presented—even in documentary form, the judge's familiarity with the trial record may inform the analysis but does not eliminate the need for principled appellate review. See *People v. English*, 2013 IL 112890, ¶ 23. The judge's discretion is bounded: the inquiry is not whether the defendant is innocent, but whether the new evidence, considered with the old, creates a probability that another jury would reach a different result. See *Coleman*, 2013 IL 113307, ¶ 97. The trial court must not retry guilt; its task is to predict the likely outcome upon retrial. See *People v. Molstad*, 101 Ill. 2d 128, 135-36 (1984).

¶ 85        When a postconviction petition proceeds to a third-stage evidentiary hearing without live testimony, that fact alone does not render the proceeding a pure question of law. The real issue is whether findings based on written evidence deserve the same deference as findings grounded in live testimony.

¶ 86        Thus, when the circuit court evaluated Wesley's recantation alongside the affidavits of Kennard and Lindsey, it necessarily made findings about their reliability and weight and concluded that Wesley's recantation was not of a conclusive character, and that Kennard and Lindsey had neither shown why their testimony could not have been discovered through due diligence, nor demonstrated that their affidavits were otherwise conclusive. These are precisely the kinds of findings the trial court, as factfinder, is tasked with making. See *Reed*, 2020 IL 124940, ¶ 51.

¶ 87        So, here is the question for me: if the parties only submitted trial transcripts and affidavits, and there is no live testimony, does that mean no credibility determinations were made?

¶ 88        One might say that, despite considering written affidavits, by reviewing newly discovered evidence and making credibility determinations based upon the totality of the presentation, the trial court is still only reading the papers—something the appellate court is equally capable of doing. But the factfinding function the trial court performs at the third stage warrants recognition, regardless of the form the evidence takes. This setting differs fundamentally from, for example, a civil summary judgment motion, where a court may not weigh competing affidavits against one another because doing so would create a genuine issue of material fact. Summary judgment is a drastic measure designed to determine if a genuine issue of material fact exists, not to resolve it by weighing evidence or determining witness

credibility. Thus, a court cannot make credibility determinations or weigh evidence in deciding a summary judgment motion. *AYH Holdings, Inc. v. Avreco, Inc.*, 357 Ill. App. 3d 17, 31 (2005). That limitation does not apply at a third-stage evidentiary hearing. There, unlike at the first and second stages, the allegations are not taken as true; instead, " 'the trial court acts as a factfinder, making credibility determinations and weighing the evidence.' " *McCoy*, 2026 IL 131565, ¶ 63 (quoting *Reed*, 2020 IL 124940, ¶ 51).

¶ 89        Beyond the nature of the determinations made, the standard of review should be further informed by a consideration already noted: the identity of the presiding judge. Generally, after an evidentiary hearing where factfinding and credibility determinations are involved, the circuit court's decision will not be reversed unless manifestly erroneous. *English*, 2013 IL 112890, ¶ 23. *De novo* review applies only where no such determinations are necessary (*i.e.*, no new evidence was presented and the issues are pure questions of law) "*unless* the judge presiding over postconviction proceedings has some special expertise or familiarity with defendant's trial or sentencing and that familiarity has some bearing upon disposition of the postconviction petition." (Emphasis added.) *Id.* Neither condition for *de novo* review is satisfied here. Newly discovered evidence was presented (*e.g.*, Wesley's 2017 affidavit, his recantation testimony from the codefendant's 2010 trial, the 2018 Cook County State's Attorney investigative report, and the affidavits of Kennard and Lindsey) albeit entirely in documentary form. Moreover, the postconviction judge was the same judge who presided over the defendant's original trial. Although the defendant was tried before a jury—and the judge was therefore not the finder of fact—the postconviction judge nonetheless was familiar with the testimony and the trial record, as discussed in *English*.

¶ 90      That familiarity, however, does not afford the trial court unfettered discretion; it must be exercised within the proper bounds of the third-stage inquiry, wherein the court should not redecide defendant's guilt in determining whether to grant relief. See *Molstad*, 101 Ill. 2d at 136 ("this does not mean that [the defendant] is innocent, merely that all of the facts and surrounding circumstances *** should be scrutinized more closely to determine [his] guilt or innocence"). Indeed, the sufficiency of the State's evidence to convict beyond a reasonable doubt is not the determination that the trial court must make. If it were, the remedy would be an acquittal, not a new trial. See *People v. Washington*, 171 Ill. 2d 475, 497 (1996) (McMorrow, J., specially concurring) ("[W]here a reviewing court determines that no rational trier of fact could find the defendant guilty beyond a reasonable doubt, the proper remedy is not a new trial but an acquittal"). Probability, not certainty, is the key, as the trial court in effect predicts what another jury would likely do, considering all the evidence, both new and old, together. See *People v. Davis*, 2012 IL App (4th) 110305, ¶¶ 62-64 ("New evidence need not be completely dispositive of an issue to be likely to change the result upon retrial.").

¶ 91      What is clear, however, is that even under the more deferential manifest error standard, reversal is warranted here. See *Coleman*, 2013 IL 113307, ¶ 98. The trial court's findings, when measured against the totality of the evidence, reveal a sufficient probability that another jury would reach a different result. See *Robinson*, 2020 IL 123849, ¶ 48; *Coleman*, 2013 IL 113307, ¶ 97.

*People v. Aaron*, 2026 IL App (1st) 240126

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 03-CR-10179; the Hon. Mary Margaret Brosnahan, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Tiffany Boye Green, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Eileen O'Neill Burke, State's Attorney, of Chicago (John E. Nowak, Brian A. Levitsky, and Sara McGann, Assistant State's Attorneys, of counsel), for the People. |