2026 IL App (1st) 240705
No. 1-24-0705
June 12, 2026

FIFTH DIVISION

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | 05 CR 08217 |
| | ) | |
| WALTER CAMPBELL, | ) | The Honorable |
| | ) | Timothy Joseph Joyce, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE ODEN JOHNSON delivered the judgment of the court, with opinion.
Presiding Justice Mitchell and Justice Wilson concurred in the judgment and
opinion.

**OPINION**

¶ 1        Defendant Walter Campbell, age 21 at the time of the offense, was found guilty by a
jury in 2012 of the first degree murder of Kevin Hoard Jr. in 2003. While awaiting trial in the
Hoard case, a different jury convicted defendant in an unrelated case of both first degree
murder and two counts of attempted first degree murder. In the unrelated case, defendant was
sentenced in 2008 to an aggregate sentence of 78 years. At the 2013 sentencing in the instant
case, the trial court found that, because of defendant's prior murder conviction, the court was

statutorily required to impose a sentence of natural life. 730 ILCS 5/5-8-1(a)(1)(c)(i) (West 2012). The trial court imposed the natural-life sentence to run concurrently with defendant's prior sentences. On direct appeal, this court affirmed defendant's conviction in the instant case. *People v. Campbell*, 2015 IL App (1st) 131196, ¶ 1.

¶ 2     At issue in the current appeal is the trial court's denial in 2024 of defendant's postconviction petition after a third-stage evidentiary hearing, which was held over 20 years after the offense. On appeal, defendant raises three claims: (1) that the trial court erred in dismissing, before the evidentiary hearing, defendant's claim that his mandatory natural-life sentence was constitutionally disproportionate as applied to him; (2) that the trial court erred in finding at the evidentiary hearing that the allegedly newly discovered evidence was unlikely to change the result at a retrial; and (3) that the trial court erred in not finding ineffective assistance of trial counsel based on trial counsel's alleged failure to introduce a prior consistent statement by defendant's mother that he was at home with her at the time of the shooting. For the following reasons, we do not find these arguments persuasive and affirm.

¶ 3                                   I. BACKGROUND

¶ 4                                  A. Trial Evidence

¶ 5     The facts established at defendant's trial were fully set forth by this court in our prior opinion, and we incorporate that opinion by reference here. See *Campbell*, 2015 IL App (1st) 131196, ¶¶ 5-21 (direct appeal). The two-day trial occurred on October 11 and 12, 2012. We summarize the trial evidence below.

¶ 6     The evidence established that, in the early evening hours of May 7, 2003, three to five young men, wearing black hoodies, walked into the middle of the street and started shooting.

The victim, Kevin Hoard Jr., was shot in the head and died. Three eyewitnesses to the shooting made pretrial identifications of defendant and testified at trial.

¶ 7    Eyewitness Tira Brown[1] testified that on May 7, 2003, she was on her front porch with the victim and others when she heard gunshots. Chanarra Gunn, who also testified at trial, was also on the porch with them. Brown recognized two of the shooters as defendant and Keon Curley, whom she knew from the neighborhood. Brown testified that defendant and Curley had guns aimed in their direction. The next day, Brown told police that defendant was one of the shooters. On a following day, Brown viewed a photo array and identified defendant and Corley as shooters. Brown testified that she clearly saw defendant firing a gun. *Campbell*, 2015 IL App (1st) 131196, ¶ 11.

¶ 8    Judith Rodgers, another eyewitness to the shooting, testified that she observed the tallest of the young men with a gun in his hand. Five minutes after the shooting, she provided a description of the shooters to police officers, which included relative heights. Rodgers estimated that two shooters were approximately five feet six inches tall, while two were approximately five feet four inches tall. After being shown photographs six days later, Rodgers identified defendant as the tallest one with a gun. However, the following day, Rodgers was unable to identify anyone from a lineup, stating " 'either the hair was different or he was bald.' " *Campbell*, 2015 IL App (1st) 131196, ¶ 6.

¶ 9    Chanarra Gunn, another eyewitness, testified that she was 14 years old at the time of the shooting. At trial, when asked if she had recognized two of the men during the shooting, she responded: " 'I really didn't.' " However, Gunn acknowledged that she had spoken with

---

[1]Although our prior opinion spelled Brown's first name as "Tina," Brown spelled her first name at the very start of her trial testimony as "T-i-r-a." See *Campbell*, 2015 IL App (1st) 131196, ¶ 11 ("Tina Brown").

police five days after the shooting and had told them that she recognized two of the shooters, one of whom was defendant. Gunn knew defendant because he lived across the street from her. Gunn had provided the same information to an assistant state's attorney (ASA). Prior to trial, Gunn had identified both defendant and Corley from photo arrays as two of the shooters. In a written pretrial statement, Gunn had stated that she observed Corley and defendant standing in the street and observed defendant firing a gun in her direction. *Campbell*, 2015 IL App (1st) 131196, ¶¶ 7-8. On cross-examination at trial, Gunn testified that she did not see the faces of the shooters because of their hoodies and that she was high when she gave her statement to the police. *Campbell*, 2015 IL App (1st) 131196, ¶ 10.

¶ 10        An Illinois State Police firearms examiner opined that, based on the ballistics evidence recovered from the scene and recovered from the victim, there were three to four guns involved. *Campbell*, 2015 IL App (1st) 131196, ¶ 12.

¶ 11        At trial, defendant presented an alibi defense, calling his mother and younger brother as witnesses. They testified that defendant was at home playing video games with the younger brother in the basement, except for a short period of time in the early evening when defendant went out on the back porch to smoke marijuana. *Campbell*, 2015 IL App (1st) 131196, ¶¶ 15-16. Rejecting the alibi defense, the jury found defendant guilty.

¶ 12                            B. *Krankel* Hearing

¶ 13        After being found guilty, defendant filed a *pro se* motion for a new trial, alleging various claims, including ineffective assistance of trial counsel. At trial, defendant had been represented by two privately-retained attorneys. The trial court held a posttrial hearing pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984), regarding defendant's claims, among others, that (1) his counsel erred in not submitting the alibi defense prior to trial, (2) his counsel should

have introduced a police report containing his mother's pretrial statement, and (3) his counsel failed to interview Robert Coker and Tenisha Coleman as possible defense witnesses. (Years later, Coker was one of two witnesses who testified at the third-stage evidentiary hearing, from which this current appeal is taken. Also, trial counsel's alleged failure to submit defendant's mother's pretrial statement was raised again as an issue at the third-stage hearing, and so is also again an issue in this current appeal.)

¶ 14    In his posttrial *pro se* motion, defendant included an affidavit from Coker, dated September 28, 2012, and a notarized letter from Coleman, dated June 13, 2012. Thus, both the affidavit and the letter were executed prior to defendant's October 2012 trial. Coleman's letter indicated that it was impossible to identify the shooters because they were "disguised with mask and/or hoodies."

¶ 15    Coker stated in his affidavit: "I tried to get a look at [the shooters'] faces to see if I recognized any of them. I didn't recognize any of them, but it was hard to tell because they had hoods tied covering their face partially." However, Coker averred, "I know [defendant] and [Curley] was not the shooters. Nothing about the 4 guys I saw resembled neither [*sic*] of them, size, height, color. I would've noticed something if it was."

¶ 16    At the *Krankel* hearing, held shortly after trial, defendant's lead trial counsel acknowledged that he had not interviewed Coleman or Coker. The ASA said that she had found Coleman's statement to the police among the police reports and that, in the ASA's words, "basically [Coleman] says that she saw nothing."

¶ 17    At the end of the *Krankel* hearing, the trial court found, first, that defendant was not prejudiced by his counsel's failure to offer the alibi defense prior to trial, since he was allowed to offer it at trial. Second, the court found, with respect to the police report regarding

defendant's mother, that the State did not try to impeach her at trial, since "her testimony seems to have been consistent with what the police claim she told them." Lastly, the trial court found that trial counsel was not ineffective for deciding not to call Coleman or Coker at trial when both of them alleged that it was impossible for them to identify the shooters. Regarding Coker's statement that nothing about the shooters "resembled" defendant, the trial court found that Coker was trying "to have his cake and eat it, too"—trying to deny without denying. For these and other reasons, the trial court denied defendant's motion.

¶ 18                      III. Sentencing and Direct Appeal

¶ 19        Prior to sentencing, counsel filed a motion arguing that defendant's age should preclude the imposition of the otherwise mandatory life sentence. Counsel also filed a motion asking the trial court to appoint an expert "concerning defendant's brain maturity." Counsel argued that "defendant did not have a fully developed brain" and attached articles in support. At the sentencing hearing, the trial court found that what counsel was arguing was applicable to a person under 18, but that defendant was "appreciably over 18," and, thus, denied the motions. The court found that it was "faced with only one sentencing option," which was mandatory life. However, the court exercised what little discretion it had to order the sentence to run concurrently with his prior sentences from an unrelated case.

¶ 20        On direct appeal, defendant argued (1) that the jury improperly received the entire grand jury testimony of witness Chanarra Gunn, (2) that the State elicited a hearsay statement from witness Judith Rogers identifying defendant as the shooter, and (3) that his trial counsel was ineffective for failing to call Coker and Coleman as witnesses and for failing to rehabilitate his mother with her prior consistent statement (which are again issues on the current appeal).

¶ 21　　　　First, defendant acknowledged that the trial court properly admitted Gunn's prior inconsistent statements but argued that the court erred by admitting Gunn's entire grand jury testimony. *Campbell*, 2015 IL App (1st) 131196, ¶ 26. We agreed that the trial court erred but found the error harmless in light of the "strong evidence" at trial. *Campbell*, 2015 IL App (1st) 131196, ¶¶ 28, 30. Second, witness Rodgers testified, over defense counsel's objection, that she later learned that the person she had identified from the photo array was defendant. We also found this error harmless. *Campbell*, 2015 IL App (1st) 131196, ¶¶ 36-37. Third, with respect to trial counsel's decision not to call Coker or Coleman, we found that neither witness "definitively" asserted that defendant was not the shooter, and, thus, we failed to "see how this evidence would have helped." *Campbell*, 2015 IL App (1st) 131196, ¶ 39. With respect to trial counsel's decision not to introduce the mother's prior consistent statement from a police report, we declined to consider the issue without the report. *Campbell*, 2015 IL App (1st) 131196, ¶ 40. For the foregoing reasons, we affirmed the trial court.

¶ 22　　　　　　　　D. Postconviction Petition and Affidavits

¶ 23　　　　On June 13, 2017, defendant filed a *pro se* postconviction petition, which was advanced to the second stage, where counsel was appointed. The original petition included affidavits from Shaunte Tanya Boyd and Michael Johnson. Appointed counsel amended and supplemented the petition to include, among other things, the police report with the mother's prior consistent statement and an affidavit from Kevin Lundy, who later testified at the third-stage hearing.

¶ 24　　　　Boyd's affidavit, dated April 11, 2017, stated that, on May 7, 2003, immediately after the shooting, she saw four men wearing hoodies and guns running out of an alley. When the men reached a vacant lot, they took their hoods off and put their guns in the front pockets of

7

their hoodies. The men then ran through the vacant lot and past where Boyd was standing. Because the men had removed their hoods, Boyd could see their faces, and none of them were defendant or Curley. Boyd recognized one of the men as "Frank," who "use[d] to live on 69th and Harper." Five years after the shooting, Boyd learned that defendant and Curley had been found guilty of Hoard's murder. However, Boyd was "very hesitant to get involved" because then Frank "would've known it was me, that told." Boyd explained that she was coming forward now because she "found out that Frank was killed, so he can't hurt me."

¶ 25        Michael Johnson's affidavit, dated February 8, 2016, stated that Johnson was not present at the shooting. However, at approximately 10:30 p.m. on the night of the shooting, he went with his friend Darryl Hamilton "to holla at this girl," named Tira, who Johnson knew from school. When Hamilton knocked on her door, Tira came out. Hamilton had a gun in his hand, and Hamilton "told her that if anybody asked her who did the shooting earlier that killed [Hoard] say that it was [Curley] and [defendant]. She looked down at the gun [and] then agreed with him." As we noted above, Tira is the first name of one of the eyewitnesses who testified at defendant's trial.

¶ 26        Postconviction counsel also attached the police report regarding defendant's mother, dated May 15, 2003, which was eight days after the offense. The report is difficult to read, because it is handwritten and uses abbreviations. Regarding her statement, the report states:

>   "Basically supports what Walter states
>
>   Goes to school after dropping her off to work
>
>   p/u from work approx 1400
>
>   usually @ Gmas Hse or home

7May03/ was @ home AF.C. P/U from work. Walt plays

video in [?] rm or bsmt Got 2 games

Usually WFU & Fu Mash Pay [?]ing in basement

Would know if basement door was opened

Door made loud squeak.

would be locked No one was allowed [?] [?] out of

hm @ [?] [?]"

The report is signed by an officer and a supervisor.

¶ 27                                    E. Second-Stage Hearing

¶ 28            At the second-stage hearing held on November 22, 2022, the trial court granted the

State's motion to dismiss defendant's claim that his mandatory life sentence violated the

proportionate penalties claim. Rejecting that claim, the trial court stated:

> "THE COURT: [Defendant] is 21 years old at the time he committed or is adjudged
>
> to have committed this offense. He was not a passive participant, such as a lookout, but
>
> he was an active participant. He was one, if not the primary, shooter in connection with
>
> this case, and as is pointed out, there are no circumstances put forth in the petition that
>
> would show specifically with respect to [defendant] that some circumstances existed
>
> which would make him more akin to someone who is under the age of 18 and whose
>
> development physically, emotionally, mentally, intelligently, in any manner would
>
> render him other than properly treated as an adult under the laws of the State of
>
> Illinois."

¶ 29            The trial court noted that, while defendant seemed to be taking advantage of the

programs offered by the Illinois Department of Corrections (IDOC), his "admirable use of his

time doesn't mean that his development earlier at the time this offense was committed shows him to have been so immature, so undeveloped that a sentence of natural life shocks the moral sense of the community." After dismissing defendant's sentencing claim, the trial court advanced the petition to the third stage for an evidentiary hearing.

¶ 30                                    F. Third-Stage Evidentiary Hearing

¶ 31          At the third-stage evidentiary hearing, held on January 11, 2024, two witnesses testified: (1) Lundy, whose affidavit was submitted with the amended postconviction petition, and (2) Coker, who had provided an affidavit more than a decade earlier, prior to trial. Neither Boyd nor Johnson testified because Johnson had passed away and defense counsel could not locate Boyd.

¶ 32          Calvin Lundy, age 39, testified that he was currently in jail for murder, serving a 62-year sentence. Lundy knew defendant from school and from the neighborhood. On May 7, 2003, the day of the shooting, Lundy was 19 years old. He was in the neighborhood at 6:30 or 7 p.m., when he observed four men with hoodies drawn tight over their faces, such that he could not "see much of it." They drew guns out of their hoodie pockets and pointed guns toward Darryl Hamilton, who was also outside on the street. Lundy hid behind a car, where he heard one shot and then seven or eight more. Lundy said the men were about his height—which was five feet, seven inches—and were stocky. Lundy did not recognize any of them because he could not see most of their faces. In total, Lundy estimated he had about 10 seconds to observe them.

¶ 33          Lundy further testified that, although he did not recognize any of the shooters, he would have been able to recognize defendant by "his body language" if defendant had been there. When asked what he meant by that, Lundy testified that defendant "got like a clumsy type

walk." Lundy estimated that he had about six seconds to watch them walk. When asked what made defendant's gait distinctive, Lundy replied that, "[j]ust when you know somebody, you could see them walking from down the block and know it is them." Lundy testified that a couple of the shooters were shorter than him, and a couple were about Lundy's height, but that defendant was over six feet tall. Lundy testified that defendant was not one of the shooters.

¶ 34 Lundy testified that, after the shooting, he saw the shooters running through an alley. Lundy did not talk to the police because that could have put him in danger. However, Lundy was incarcerated in 2005, and he saw defendant in IDOC in 2021 in the law library. Lundy told defendant what happened the last time Lundy was in their neighborhood, and that is when Lundy found out what defendant was locked up for. Defendant asked Lundy to execute an affidavit, but defendant did not tell Lundy what to put in it. Lundy then identified his affidavit, which was dated December 30, 2021. Lundy swore that he wrote the affidavit up and that it was his own handwriting.

¶ 35 After direct examination, the State asked for a sidebar, in which the ASA informed the court that, prior to the hearing, the assistant public defender (APD) had informed him that Lundy had informed the APD that Lundy did not write this affidavit in his own hand and that it was defendant who had written it out. The APD agreed, explaining that, "for the first time today [Lundy] told me that there was another affidavit that he had written in his own hand but it was not able to be read," because it was illegible. Therefore, Lundy had defendant write out the affidavit that Lundy had previously prepared.

¶ 36 On cross-examination, Lundy acknowledged that the affidavit was not in his handwriting, but in defendant's handwriting. Lundy explained that he wrote out an affidavit, but his handwriting looked "like chicken scratch," so defendant wrote out Lundy's words.

After defendant wrote it out, Lundy signed it and got it notarized. Defendant did not ask Lundy to change anything. Lundy testified that defendant told him that defendant was locked up for the murder of Darryl Hamilton.

¶ 37     The next witness was Robert Coker, age 40, who testified that he was employed by a company that provides help at home to the elderly and the handicapped. On May 7, 2003, the day of the shooting, he was 20 years old, and he went to visit his old neighborhood when he saw four guys with hoodies and "things covering their face, like scarves." Coker said it was a nice day, when you could wear a t-shirt, and yet these men were "all hoodied up and scarfed up" and wearing "athletic gloves." It made Coker nervous. As to the time, it was "around 7-ish." Coker could see only a part of their faces, like their eyes. Coker testified that he was six feet one inch, and they were all shorter than him, and that "none of them was six feet." They continued walking south, and Coker continued walking east, when he heard gunshots. When he heard the gunshots, he turned around and saw the four guys standing in the street, with their arms up, and shots were ringing out. Coker ran to a friend's house and did not contact the police because he was afraid.

¶ 38     Coker testified that he knew defendant because, at one time, defendant lived in the building across the street from Coker. In 2012, Coker signed an affidavit which he wrote out in his own handwriting. In 2011 or 2012, Coker learned that defendant and Curley had been charged in the shooting, and Coker thought that was "messed up" because Coker had not seen them in the vicinity. Coker contacted defendant's mother and called defendant's counsel. Defendant's mother gave Coker a blank form, and he wrote out the affidavit at home. Then he had it notarized and gave it to defendant's mother. Neither defendant's counsel nor defendant's mother contacted him in 2012.

¶ 39        Coker also testified that, in 2015, he reached out to defendant's mother because he heard that defendant had lost his case. Defendant's mother confirmed that was so. She also asked him to complete a second affidavit because they had lost the first one, and he did. The second affidavit, which was dated August 2016, is different than the first one, in that the second one added information about the lawyer that was not in the first one—namely, that Coker found out that the lawyer was ill and had passed away. On cross, Coker stated that he typed the 2016 affidavit on the computer. Although he had stated that nothing about the four shooters resembled defendant in size, height and color, he acknowledged that the shooters were African American and so was defendant.

¶ 40        After the testimony concluded, the defense introduced the affidavits of Boyd and Johnson. *Supra* ¶¶ 23-24. Regarding Boyd, defense counsel stated that he had spoken to her two years ago, but "she has fallen off the face of the earth according to my investigator." Regarding Johnson, counsel introduced a certified Cook County death certificate for him. Counsel represented to the court that he had spoken to Johnson before Johnson's "untimely death" and that Johnson had identified himself as the person who executed the affidavit. The affidavits and death certificate were admitted into evidence over the State's objection. Lastly, defendant introduced the police report regarding defendant's mother's statement (*supra* ¶ 26), which had been produced by the State as part of the original trial discovery and was admitted. The State sought to admit the appellate record and the certified copy of conviction for witness Lundy, both of which were admitted. The evidentiary portion of the hearing concluded, and the matter was adjourned for later argument by the parties.

¶ 41        On March 18, 2024, the trial court heard argument and delivered its ruling. First, the trial judge, who had presided over the trial, stated that he had an "independent recall" of the

13

trial and that he had also reviewed his notes from the trial. The court observed that two claims were pending: (1) defendant's actual innocence claim and (2) his claim of ineffective assistance by trial counsel.

¶ 42    The trial court noted that, to establish a claim of actual innocence, the evidence must be (1) newly discovered, (2) material and not cumulative, and (3) of such a conclusive character as to probably change the result on retrial. First, the trial court found that, even if Coker's affidavit was not newly discovered, it was reasonable to put it forward in connection with the statements of Lundy, Boyd and Johnson, which were newly discovered since trial. Second, the court found that these statements, which asserted defendant was not one of the shooters, were material and not cumulative.

¶ 43    Of the three elements of an actual innocence claim, the court noted that the third and last element, the conclusive character, was the most important. The court observed that this element required it to make credibility determinations. First, with respect to the affidavits of Boyd and Johnson, the court found that they were "entitled to very little, if any weight." Regarding Boyd's affidavit, the court noted that "she saw some guy named Frank." The court found that there was "no ring of truth" to Boyd's affidavit "because she doesn't identify [Frank] or any of these other persons with any particularity whatsoever." Johnson's affidavit challenged the credibility of Tira Brown, whose testimony, the court observed, had not changed from what she told police, through what she stated at the grand jury, to her testimony at trial. Johnson claimed that Hamilton threatened Brown with a gun to name defendant and Curley as the culprits if asked and that Brown looked down at the gun and agreed. The court found that was "fantastical," noting that it did not explain why Brown said anything to the police. If approached, "she could have just kept her mouth shut." As a result, the court found

the claim that Brown was compelled by Hamilton to falsely implicate defendant and Curley "doesn't make sense on [its] face." Thus, the court found that "Johnson's affidavit is given no credibility."

¶ 44 Next, the court looked at the testimony of Lundy and Coker, who testified that they saw four men wearing hoods pulled so tightly over their faces that one could barely see any aspect of their faces. The court noted that "they don't know who fired these shots but they do know it wasn't" defendant. The court observed that, while this was "not an untenable scenario," the court did not "believe Mr. Lundy's testimony in that regard, nor did [it] believe Mr. Coker's." After observing "the manner" in which they testified, the court did not believe either one of them. In addition, Lundy's credibility was impeached by the fact that he is a convicted murderer. As a result of its credibility findings with respect to the affidavits and the testimony, the court denied the actual innocence claim based on them.

¶ 45 The court stated that "the gist" of defendant's ineffective assistance claim was that, after having presented the alibi testimony of defendant's mother and brother, counsel should have presented the police report which indicated that the mother had told police on May 15, 2003, that defendant was at home with her and her son. The court explained that, although hearsay, a prior consistent statement may be admitted to rebut a motive of recent fabrication, if the statement was made before the declarant would have had the motive to fabricate. In the case at bar, since the police report occurred after defendant's arrest, the court reasoned that the mother would have had the same motives when speaking to the police as she did when she testified at trial. "Consequently," the trial court found that the statement was not admissible and, thus, its absence had no "effect on the result of the trial" and could not "constitute ineffective assistance" of counsel.

¶ 46    After the petition was denied on March 18, 2024, defendant filed a timely notice of appeal on March 20, 2024,[2] and this appeal followed.

¶ 47                                II. ANALYSIS

¶ 48                            A. The Act's Stages

¶ 49    Defendant appeals the dismissal of his postconviction petition, which was dismissed in part at the second stage and in part at the third stage.

¶ 50    The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2024)) provides a statutory remedy for criminal defendants who claim their constitutional rights were violated in the trial court. *People v. Edwards*, 2012 IL 111711, ¶ 21. It is not a substitute for appeal but, rather, a collateral proceeding that attacks a final judgment. *People v. Ealy*, 2024 IL App (1st) 221748, ¶ 30.

¶ 51    The Act generally provides for three stages of review by the trial court. *People v. Domagala*, 2013 IL 113688, ¶ 32. At the first stage, the trial court may summarily dismiss a petition only if it is frivolous and patently without merit. 725 ILCS 5/122-2.1(a)(2) (West 2024); *Domagala*, 2013 IL 113688, ¶ 32. At the second stage, counsel is appointed if a defendant is indigent and unrepresented by counsel. 725 ILCS 5/122-4 (West 2024); *Domagala*, 2013 IL 113688, ¶ 33. After counsel determines whether to amend or supplement the petition, the State may file either a motion to dismiss or an answer to the petition. 725 ILCS 5/122-5 (West 2024); *Domagala*, 2013 IL 113688, ¶ 33; *Ealy*, 2024 IL App (1st) 221748, ¶ 32. At the second stage, the trial court must determine "whether the petition and any accompanying documentation make a substantial showing of a constitutional violation." *People v. Edwards*, 197 Ill. 2d 239, 246 (2001).

---

[2]A second notice of appeal was also filed on March 26, 2024.

¶ 52    "Since there are no factual issues" at the second stage of the proceedings, "the question is essentially a legal one, which requires the reviewing court to make its own independent assessment of the allegations of the petition and supporting documentation." *People v. Sanders*, 2016 IL 118123, ¶ 31. Since we are reviewing an essentially legal question, our standard of review is *de novo. Sanders*, 2016 IL 118123, ¶ 31. *De novo* consideration means that we perform the same analysis that a trial judge would perform. *People v. Carrasquillo*, 2020 IL App (1st) 180534, ¶ 107.

¶ 53    If a defendant makes a "substantial showing" at the second stage, then he is entitled to a third-stage evidentiary hearing. *Domagala*, 2013 IL 113688, ¶ 34. At a third-stage evidentiary hearing, the defendant bears the burden of proving the alleged constitutional violation by a preponderance of the evidence. *People v. Coleman*, 2013 IL 113307, ¶ 92. The preponderance standard is the standard whether the defendant alleges a constitutional violation or raises a claim of actual innocence. *Coleman*, 2013 IL 113307, ¶ 92. The Act provides that, at the hearing, the trial court "may receive proof by affidavits, depositions, oral testimony, or other evidence." 725 ILCS 5/122-6 (West 2024).

¶ 54                                B. Natural Life Sentence

¶ 55    Defendant's first claim is that his sentence of natural life violates the proportionate penalties clause as applied to him. This claim was dismissed by the trial court at the second stage, so we apply a *de novo* standard of review. *Sanders*, 2016 IL 118123, ¶ 31.

¶ 56    Defendant was sentenced pursuant to section 5-8-1(a)(1)(c)(i) of the Unified Code of Corrections, which provides that "the court shall sentence the defendant to a term of natural life imprisonment if the defendant, at the time of the commission of the murder, had attained the age of 18, and *** (i) has previously been convicted of first degree murder." 730 ILCS 5/5-

8-1(a)(1)(c)(i) (West 2024). In addition to the two convictions of first degree murder, defendant also had two convictions of attempted murder.

¶ 57    Statutes are presumed constitutional, and the party challenging the statute has the burden of clearly establishing the alleged invalidity. *People v. Coty*, 2020 IL 123972, ¶ 22. In addition, a court must construe the statute so as to uphold its constitutionality, if reasonably possible. *Coty*, 2020 IL 123972, ¶ 22. Constitutionality of a statute is a question of law that we review *de novo*. *Coty*, 2020 IL 123972, ¶ 22. *De novo* review means that we perform the same analysis that a circuit court would and that we owe no deference to the trial court's decision. *People v. Avdic*, 2023 IL App (1st) 210848, ¶ 25.

¶ 58    Defendant claims that this statute, as applied to him, violates the proportionate penalties clause in our state constitution. This clause provides: "All penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. However, our supreme court has "repeatedly recognized that the legislature has the power to prescribe penalties for defined offenses, and that [this] power necessarily includes the authority to prescribe mandatory sentences, even if such sentences restrict the judiciary's discretion in imposing sentences." *Coty*, 2020 IL 123972, ¶ 24. Our supreme court has affirmed in other cases the application of statutorily mandated natural life sentences. See *Coty*, 2020 IL 123972, ¶ 31 (discussing a prior case). In *Coty*, 2020 IL 123972, ¶ 46, for example, our supreme court found that a mandatory natural life sentence imposed upon an intellectually disabled adult was constitutional as applied to him.

¶ 59    In the case at bar, defendant does not point to any disability or unique or differentiating circumstance that would make his situation closer to that of someone under the age of 18. He argues only his age, which was over 21 at the time of the offense. Defendant's brief to this

18

court argues that "his age rendered him less culpable." His appellate brief states that "[t]he crux of [postconviction] counsel's argument was that the presentence investigative report and [defendant's progress while in prison was consistent with scientific studies showing juveniles were more susceptible to rehabilitation and the facts of the case were consistent with the impulsivity of youth described in *Miller*." See *Miller v. Alabama*, 567 U.S. 460 (2012). However, these circumstances, which are not unique to defendant, were presumably considered by our legislature, and "the authority to determine appropriate public policy is vested in the legislature, not the courts." *Board of Education of Dolton School District 149 v. Miller*, 349 Ill. App. 3d 806, 811 (2004); *Morris v. William L. Dawson Nursing Center, Inc.*, 187 Ill. 2d 494, 499 (1999). "We generally defer to the legislature in the sentencing arena because the legislature, institutionally, is better equipped to gauge the seriousness of various offenses and to fashion sentences accordingly." *People v. Buffer*, 2019 IL 122327, ¶ 35. In the case at bar, where defendant has failed to identify a unique or differentiating circumstance, we defer to the legislative judgment regarding young adults who are defendant's age. Accordingly, defendant's statutorily required sentence of natural life, after being found guilty of killing two people, did not violate the proportionate penalties clause as applied to him.

¶ 60        For the foregoing reason, and exercising *de novo* review, we can find no error in the trial court's second-stage dismissal of defendant's sentencing claim.

¶ 61                                C. Actual Innocence Claim

¶ 62        Defendant's second claim is that the trial court erred in finding, after a third-stage evidentiary hearing, that the evidence which defendant presented was unlikely to change the result at a retrial.

¶ 63          Specifically, the trial court found that the evidence that defendant presented was not credible. Generally, if the evidentiary hearing involved fact-finding and credibility determinations, the trial court's decision will not be reversed on appeal unless the decision is against the manifest weight of the evidence. *People v. English*, 2013 IL 112890, ¶ 23; *People v. Aaron*, 2026 IL App (1st) 240126, ¶ 58. As our supreme court has recently stressed, a reviewing court accords this deference because it is the trial court who is "in the best position to observe the witnesses" and, hence, judge credibility. *People v. McCoy*, 2026 IL 131565, ¶ 51. A trial court's decision is against the manifest weight of the evidence if its decision was not based on the evidence presented, its decision was unreasonable, or the opposite conclusion is clearly evident. *People v. Morgan*, 2025 IL 130626, ¶ 21.

¶ 64          To succeed on a claim of actual innocence, a defendant must present evidence that is (1) new, (2) material and noncumulative, and (3) so conclusive that it would probably change the result on retrial. *People v. Robinson*, 2020 IL 123849, ¶ 47; *Coleman*, 2013 IL 113307, ¶ 96. The evidence is new if it was discovered after trial and could not have been discovered earlier through the exercise of due diligence. *Robinson*, 2020 IL 123849, ¶ 47; *Coleman*, 2013 IL 113307, ¶ 96. It is material and noncumulative if it is relevant, probative of defendant's innocence, and adds to what the jury already heard. *Robinson*, 2020 IL 123849, ¶ 47; *Coleman*, 2013 IL 113307, ¶ 96.

¶ 65          While all three elements are required to succeed on an actual innocence claim, it is the third element—the conclusive character element—that "is the most important element of an actual innocence claim." *Robinson*, 2020 IL 123849, ¶ 47. "[T]he new evidence supporting an actual innocence claim need not be entirely dispositive ***." *Robinson*, 2020 IL 123849, ¶ 56. "Rather, the conclusive-character element requires only that the [defendant] present evidence

that places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt." *Robinson*, 2020 IL 123849, ¶ 56; see *Coleman*, 2013 IL 113307, ¶ 97 ("Probability, not certainty, is the key ***.").

¶ 66    In the case at bar, it was this last element that the trial court found lacking because it found that the evidence that defendant presented was simply not credible. With respect to the two witnesses, the trial court stated that, after observing their manner on the witness stand, it did not believe either one of them.

¶ 67    The first witness, Lundy, testified that he just happened to run into defendant in the prison library 18 years after the offense and that he just happened to have been at the exact spot, at the exact time, 18 years earlier, when the offense—which defendant was charged with—had occurred. Lundy, who was a convicted murderer himself, serving a 62-year sentence, signed an affidavit in defendant's handwriting. Lundy apparently had difficulty remembering his facts, where he initially swore on direct that the affidavit was in his handwriting and where he testified that defendant told him that defendant was in jail for the murder of Darryl Hamilton. The trial court's finding that Lundy's testimony was not credible was well-supported by the evidence.

¶ 68    Coker, the second witness, testified, as did Lundy, that although the shooters' faces were almost completely covered and that he could not recognize any of them, he still knew defendant was not one of them. Coker went one step further than Lundy and said that the shooters were wearing not only hoodies but also "things covering their face, like scarves" and athletic gloves. Coker asserted that nothing about the shooters resembled defendant in size, height, or color, but he acknowledged that the shooters and defendant were all African American. The trial court found that this was "not an untenable scenario," but the judge did

21

not believe Coker after watching him testify. Not having the benefit of witnessing Coker's testimony ourselves, we do not discount the trial court's credibility finding. Also, while this was "not an untenable scenario," it was also not necessarily a persuasive scenario either, where three eyewitnesses to the shooting were able to make pretrial identifications of defendant.

¶ 69    Further, Coker's testimony was not newly discovered, despite the trial court's decision to consider it along with the other evidence. The trial court found that, since the other evidence was newly discovered, a hearing was required anyway and that "there's every reason" for the defense to "put forth" Coker's testimony "regardless of whether his particular information, Coker's particular information, can be technically deemed newly discovered."

¶ 70    Coker's affidavit, which was executed prior to trial, was considered at the *Krankel* hearing held immediately after defendant's trial, and it was already the subject of one opinion by this court. In our prior opinion, we found:

> "Defendant *** contends that his counsel was ineffective for failing to present witnesses Coker and Coleman, whose testimony would have supported his defense. However, as the trial court noted, neither witness definitively testified that defendant was not the shooter. We do not see how this evidence would have helped defendant's case in light of Brown's strong identification testimony and other corroborating evidence, as discussed above." *Campbell*, 2015 IL App (1st) 131196, ¶ 39.

Regarding Coker, we have respect for the credibility finding made by the trial court, which was able to observe the witness in person. In any event, Coker's existence as a possible witness was known to defendant prior to trial and already considered by this court in a prior opinion.

¶ 71    With respect to the affidavits of Boyd and Johnson, the trial court found that they were "entitled to very little, if any weight." Boyd claimed that the shooters paused in their running

to take their hoods down, shortly after the shooting, and that she could then see that one of the shooters was "Frank." Boyd did not identify "Frank" in any way, except to say that he was now dead. The trial court called Johnson's affidavit "[o]n its face *** fantastical." Johnson claimed that Darryl Hamilton told witness Tira Brown that, if anybody asked her who did the shooting, to say that it was Curley and defendant. According to Johnson, Brown looked down at Hamilton's gun and agreed. However, as the trial court noted, she could have just said nothing. Instead, she gave consistent statements to the police and at trial. Further, defendant offered no explanation to justify why Hamilton chose to implicate Curley and defendant as opposed to any other individuals.

¶ 72       After carefully reviewing the evidence presented at the third-stage evidentiary hearing, we cannot say that the trial court's finding was against the weight of the evidence.

¶ 73                        D. Ineffective Assistance Claim

¶ 74       Lastly, defendant claims that the trial court erred in not finding ineffective assistance of trial counsel, based on trial counsel's alleged failure to introduce a prior consistent statement by defendant's mother that he was at home with her at the time of the shooting. As noted above, we will not reverse the trial court's decision unless the decision was against the manifest weight of the evidence. *English*, 2013 IL 112890, ¶ 23; *Aaron*, 2026 IL App (1st) 240126, ¶ 58.

¶ 75       To determine whether defendant was denied his right to effective assistance of counsel, we apply the familiar two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Albanese*, 104 Ill. 2d 504, 526-27 (1984) (adopting *Strickland*). Under *Strickland*, a defendant must prove both (1) that his attorney's actions constituted errors so serious as to fall below an objective standard of reasonableness and (2) that, absent these errors,

there was a reasonable probability that the outcome of the proceeding would have been different. *People v. Carlisle*, 2015 IL App (1st) 131144, ¶ 71.

¶ 76      Under the first prong of the *Strickland* test, the defendant must prove that his counsel's performance fell below an objective standard of reasonableness, as measured against prevailing professional norms. *Carlisle*, 2015 IL App (1st) 131144, ¶ 72; see *English*, 2013 IL 112890, ¶ 34. Under the second prong, the defendant must show that, "but for" counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different. (Internal quotation marks omitted.) *Carlisle*, 2015 IL App (1st) 131144, ¶ 72. "[A] reasonable probability that the result would have been different is a probability sufficient to undermine confidence in the outcome—or put another way, that counsel's deficient performance rendered the result of the trial unreliable or fundamentally unfair." *People v. Evans*, 209 Ill. 2d 194, 220 (2004).

¶ 77      To prevail, a defendant must satisfy both prongs of the *Strickland* test. *Carlisle*, 2015 IL App (1st) 131144, ¶ 73. Thus, if one of the two prongs is missing, we need not consider the other one. *Carlisle*, 2015 IL App (1st) 131144, ¶ 73. In addition, our analysis does not have to proceed in any particular order. *In re D.F.*, 2025 IL App (1st) 240914, ¶ 106.

¶ 78      While we are not required to proceed in a particular order, we consider first the alleged deficiency of counsel. When considering whether counsel's performance was deficient, a reviewing court keeps in mind "the wide range of reasonable professional assistance." (Internal quotation marks omitted.) *People v. Patterson*, 217 Ill. 2d 407, 441 (2005). "Generally, matters of trial strategy will not support a claim of ineffective assistance of counsel unless counsel failed to conduct any meaningful adversarial testing." *Patterson*, 217 Ill. 2d at 441.

¶ 79    In the case at bar, the trial court found neither prong because it concluded that the statement at issue—which defendant claimed that his trial attorney should have introduced—was simply not admissible. Defendant contended that his trial counsel should have sought to admit a police report that contained a prior statement by his mother. Defendant argued that the statement was admissible, although it was admittedly hearsay, because it was allowed pursuant to a hearsay exception. Illinois Rule of Evidence 613(c) (eff. Sept. 17, 2019) permits the admission of a prior statement that is consistent with a witness's trial testimony[3] "for rehabilitation purposes only and not substantively" when "the statement is offered to rebut an express or implied charge that:"

> "(i) the witness acted from an improper influence or motive to testify falsely, if that influence or motive did not exist when the statement was made; or

> (ii) the witness's testimony was recently fabricated, if the statement was made before the alleged fabrication occurred."

¶ 80    Defendant alleges that the State impugned the mother's motives during cross-examination. On direct examination, defense counsel asked her if she would lie for her son in order to protect him from a murder charge, and she said: "No. No." On cross, the State followed up by asking if she loved her son, and she replied yes. The State also asked if she was present in court the day before, watching all the witnesses testify, and she acknowledged that she had been.

---

[3]Neither party on appeal discusses the portion of the police report which contains a prior statement by defendant—namely, the initial notation which says: "Basically supports what [defendant] states." Obviously, this notation is not admissible as a prior consistent statement because defendant did not testify. Rule 613(c) permits the introduction of prior consistent statements only "when the declarant testifies at the trial." Ill. R. Evid. 613(c) (eff. Sept. 17, 2019). Of course, the report could have been redacted prior to admission, if it was otherwise admissible.

¶ 81     At the third-stage evidentiary hearing, the trial court found that the report was not admissible. The court explained that a prior consistent statement may be admitted to rebut a motive of recent fabrication, if the statement was made before the declarant would have had the motive to fabricate. In the case at bar, since the police report occurred after defendant's arrest, the court reasoned that the mother would have had the same motives when speaking to the police as she did when she testified at trial and, therefore, the statement was not admissible. Pursuant to the trial court's finding, since the statement was not admissible, trial counsel could not have been ineffective for not seeking to introduce it, and defendant could not have suffered any prejudice.

¶ 82     On this appeal, defendant argues that the trial court conflated the two exceptions in Rule 613(c), which we quoted above. See *supra* ¶ 79. Defendant argues that when the State asked if she had listened to the other witnesses, the State was implicitly suggesting that she had tailored her testimony accordingly. Defendant argues that the police report was admissible pursuant to the second exception to rebut a charge that her testimony was "recently fabricated," *i.e.*, since the day before, when she heard the testimony of other witnesses. Ill. R. Evid. 613(c)(ii) (eff. Sept. 17, 2019). By contrast, defendant contends, the trial court applied the first exception, which asks instead about her "motive to testify falsely." Ill. R. Evid. 613(c)(i) (eff. Sept. 17, 2019). As defendant correctly notes, the two exceptions are linked by an "or" rather than an "and." Therefore, by their plain language, the exceptions are two independent grounds for admission.

¶ 83     On appeal, the parties argue about whether the police report was, or was not, admissible under the named hearsay exception. However, even if it was admissible, its admission was still a question of trial strategy. The police report did not track the mother's testimony exactly. Her

statement in the police report emphasized her son's presence in the basement, stating she "[w]ould know if [the] basement door was opened [because the] [d]oor made [a] loud squeak." By contrast, she testified at trial that he came in and out of the basement and hung out on the back porch. We cannot say that trial counsel's performance fell below an objective standard of reasonableness, by deciding not to admit the police report to rebut a suggestion that the mother tailored her testimony in light of what she had just heard. See *Carlisle*, 2015 IL App (1st) 131144, ¶ 72. To the extent that the jury was going to discount a mother's testimony, it was due to the very natural and innate desire to protect a child, and defense counsel did what he could to counter that inference.

¶ 84    Further, even if we could find deficient performance, we could not find a reasonable probability that the result of the proceeding would have been different. *Carlisle*, 2015 IL App (1st) 131144, ¶ 72. The statement, even if admitted, could be used "for rehabilitation purposes only" and not as substantive evidence. As the trial court noted, defendant's mother had the same motive to say he was at home, while speaking to the police after he was arrested, as she did at trial. Thus, the police report did little to counter the doubt inherent with any mother's testimony. See *People v. Lacy*, 407 Ill. App. 3d 442, 466 (2011) (a jury was likely to give "less weight" to an alibi witness who was the aunt with whom defendant lived); *People v. Deloney*, 341 Ill. App. 3d 621, 635 (2003) (where alibi witnesses were defendant's cousins, "their credibility may have carried little weight").

¶ 85    Since we can find neither prong of the *Strickland* test, we must affirm.

¶ 86                                    III. CONCLUSION

¶ 87    On appeal, defendant raised three claims: (1) that the trial court erred in dismissing, before the evidentiary hearing, defendant's claim that his mandatory natural-life sentence was

constitutionally disproportionate as applied to him; (2) that the trial court erred in finding at the evidentiary hearing that the alleged newly discovered evidence was unlikely to change the result at a retrial; and (3) that the trial court erred in not finding ineffective assistance of trial counsel based on trial counsel's alleged failure to introduce a prior consistent statement by defendant's mother that he was at home with her at the time of the shooting. After a careful review, we do not find these arguments persuasive and affirm.

¶ 88          Affirmed.

*People v. Campbell*, 2026 IL App (1st) 240705

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 05-CR-08217; the Hon. Timothy Joseph Joyce, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Rachel M. Kindstrand, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Eileen O'Neill Burke, State's Attorney, of Chicago (John E. Nowak, Paul E. Wojcicki, and Amy McGowan, Assistant State's Attorneys, of counsel), for the People. |